Edward S. O'BRIEN, Petitioner,

v.

John MARSHALL, Respondent.

No. C.A.02–10067–MLW.

United States District Court,
D. Massachusetts.

Aug. 25, 2005.

arguments, no necessity exists to pursue these     claims through an evidentiary hearing.

Edward B. Gaffney, Edward B. Gaffney, Wayland, MA, for Petitioner Edward S. O'Brien.

Eva M. Badway, Attorney General's Office, Natalie S. Monroe, Attorney General's Office, William J. Meade, Attorney General's Office, Boston, MA, for Respondent John Marshall.

## MEMORANDUM AND ORDER

WOLF, District Judge.

The court has considered the attached Magistrate Judge's Report and Recommendation that this court dismiss Edward S. O'Brien's Petition for Writ of Habeas Corpus (the "Report"), and both petitioner's and respondent John Marshall's objections to the Report. The Report (Docket No. 27), which is hereby adopted and incorporated in this Memorandum, is persuasive for the reasons stated by the Magistrate Judge, as amplified below. The petition is, therefore, being dismissed.

■ Petitioner asserts three objections to the Report. First, he contends that, contrary to the conclusion of the Magistrate Judge, the exclusion of certain statements by the murder victim to her neighbor represented an unreasonable application of the law established by the Supreme Court in *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and violated his federal constitutional right to due process. More specifically, the trial court excluded evidence that the victim had told a neighbor that she had evicted her brother-in-law Aristedes Ortiz from her home for drug dealing and was in fear of him. While other evidence concerning Ortiz was admitted, these statements were excluded by the trial court as hearsay, and the Supreme Judicial Court affirmed that decision. *See Commonwealth v. O'Brien,* 432 Mass. 578, 736 N.E.2d 841, 851 (2000).

■ With certain exceptions, federal law, like Massachusetts law, deems hearsay to be insufficiently reliable to be admitted into evidence in a criminal trial. *See* Fed.R.Evid. 802. Part of the excluded evidence, the victim's statement that she feared Ortiz, might have been admissible in a federal trial pursuant to the state of mind exception to the hearsay rule. *See* Fed.R.Evid. 803(3); *United States v. Grassi,* 783 F.2d 1572, 1578 (11th Cir.1986). However, the Federal Rules of Evidence are not coextensive with the requirements of due process. *See Dickerson v. United States,* 530 U.S. 428, 437, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *United States v.*

*Sampson,* 332 F.Supp.2d 325, 340–41 (D.Mass.2004).

The Supreme Judicial Court held that "[t]he judge correctly excluded the evidence [of the victim's expression of fear of Ortiz] as hearsay" under Massachusetts law. *O'Brien,* 736 N.E.2d at 851 (citing *Commonwealth v. Mandeville,* 386 Mass. 393, 436 N.E.2d 912 (1982)). This decision did not involve an unreasonable application of federal law.

Petitioner does not claim that the Magistrate Judge incorrectly stated the "unreasonable application" of Supreme Court precedent standard and, in any event, the court finds he did not. *See* Report at 12–14. As explained in the Report, at 16–20, *Chambers* involved a court's refusal to permit the petitioner to cross-examine as an adverse witness a person who had confessed to the murder that the petitioner was charged with committing and its further refusal to allow the petitioner to introduce the testimony of three witnesses who had heard the confession. *Chambers,* 410 U.S. at 291–92, 93 S.Ct. 1038. *Chambers* stands for the principle that a defendant has a right to call witnesses and to confront and cross-examine them. *Id.* at 294, 93 S.Ct. 1038. In the instant case, there is no contention that Ortiz confessed to the murder, that testimony of any such confession was excluded, or that the court refused to allow any witness to be called. *See* Report at 19–20. *Chambers,* 410 U.S. at 291–92, 294, 93 S.Ct. 1038. Distinguishing the instant case from *Chambers* does not represent an unreasonable application of a clearly established Supreme Court precedent. *See Hurtado v. Tucker,* 245 F.3d 7, 15–16 (1st Cir.2001), *cert. denied,* 534 U.S. 925, 122 S.Ct. 282, 151 L.Ed.2d 208 (2001).

▇▇ Second, petitioner asserts that his Fifth Amendment right against self-incrimination was violated because the "transfer judge" who decided that he should be tried as an adult rather than as a juvenile drew adverse inferences from petitioner's unwillingness to participate in available treatment programs. Under Massachusetts law, "[a] transfer hearing is held to determine whether 'the child presents a danger to the public, and whether the child is amenable to rehabilitation within the juvenile justice system.'" *Commonwealth v. O'Brien,* 423 Mass. 841, 673 N.E.2d 552, 556 (1996) (quoting G.L. c. 119, 61). "There is a rebuttable presumption that a juvenile charged with murder is dangerous to the public and not amenable to rehabilitation." *Id.* This imposes on the juvenile an initial burden of production. *Id.* "[T]reatment programs for pretrial detainees at the juvenile facility where [petitioner] was held are specifically designed to offer treatment while actively discouraging detainees from discussing the circumstances surrounding their pending charges." *O'Brien,* 736 N.E.2d at 849.

Petitioner does not contend that the statutory scheme itself violates his Fifth Amendment right not to be compelled to incriminate himself. Rather, he asserts that in this case the transfer judge impermissibly drew adverse inferences from his silence and the Supreme Judicial Court unreasonably applied Supreme Court precedent in affirming his decision to do so.

The Supreme Judicial Court explained that:

The judge's findings were not based on the defendant's exercise of his right to remain silent, but on the defendant's failure to see any value in any treatment programs. The findings also were based on the defendant's conduct at the facility where he was held and the peer group with which he chose to associate.

*Id.* at 849. Petitioner contends that the foregoing indicates that the Supreme Judicial Court unreasonably applied the Supreme Court's decision in *Schmerber v.*

*California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), that the Fifth Amendment "protects an accused ... from ... provid[ing] the State with evidence of a testimonial or communicative nature." However, as the Magistrate Judge noted, "the transfer judge, in determining whether the petitioner should be tried as a juvenile or as an adult, had the right to take into consideration the actions and behavior of the petitioner." Report at 24–25. Once again, the petitioner has not shown that the manner in which this was done in this case involved an unreasonable application of clearly established Supreme Court precedent. *See Hurtado,* 245 F.3d at 15–16.

■ Finally, petitioner argues that his right to substantive due process was violated when, after reversing the first transfer judge who held that petitioner should be tried as a juvenile and finding that he did not properly respond to a motion for recusal, the Supreme Judicial Court removed him from the case. *See O'Brien,* 736 N.E.2d at 848–49. The Magistrate Judge correctly concluded that petitioner had not shown that this decision resulted from an unreasonable application of federal law, in part because "petitioner points to no Supreme Court case standing for the proposition that removal of a judge presiding over a transfer hearing (or any hearing) violates a defendant's due process rights." Report at 27.

The Magistrate Judge, in the interest of completeness, also noted that "the [Supreme Judicial Court] did rely on an adequate and independent state ground when it denied the petitioner's appeal on the issue of the removal of the transfer judge." *Id.* at 28 n. 7. The respondent asserts that because the Supreme Judicial Court relied on an adequate and independent state ground, the Magistrate Judge should not have addressed the merits of petitioner's

claim concerning the removal of the first transfer judge. This, and respondent's additional objection concerning the "plain statement rule," are not material to the outcome of this case. Therefore, they are not being decided.

For the reasons stated in the Report, as amplified in this Memorandum, O'Brien's Petition for Writ of Habeas Corpus (Docket No. 1) is hereby DENIED.

### REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS (# 1)

COLLINGS, United States Magistrate Judge.

## I. Introduction

On or about January 14, 2001, Edward S. O'Brien ("O'Brien" or the "petitioner") commenced the instant action by filing a petition for writ of habeas corpus (the "petition") pursuant to 28 U.S.C. § 2254(# 1). On March 19, 2002, the respondent John Marshall ("Marshall" or the "respondent") filed a Motion to Dismiss the Petition for Writ of Habeas Corpus with supporting memorandum (# 5)[1], an Answer to the petition (# 6), and a Supplemental Answer in two volumes (## 7, 8). In his memorandum of law, the respondent argued that the petitioner's petition for writ of habeas corpus should be dismissed because the petitioner had failed to exhaust available state court remedies as to Grounds 2, 4 and 7 of the petition.

On March 20, 2002, the District Judge to whom this case is assigned (Wolf, J.) referred the respondent's motion to dismiss to the undersigned for a Report and Recommendation. On April 30, 2002, the petitioner submitted an Opposition to the Motion to Dismiss (# 11), and on May 7, 2002, this Court issued a Report and Recom-

---

1. In the official docket of the case, the respondent's Motion to Dismiss and the supporting memorandum are docketed together as docket entry # 5.

mendation (# 12), recommending that the respondent's motion to dismiss be denied. On May 16, 2002, the respondent filed an Objection to the Report and Recommendation (# 13), but on June 21, 2002, Judge Wolf issued an Order (# 14) denying the motion to dismiss and again referring the case to the undersigned for a Report and Recommendation on the merits of the petition.

On November 21, 2002, the petitioner filed a Memorandum of Law in Support of Petition for Habeas Corpus (# 19), in which he *inter alia* waived argument on Grounds 2, 3, 4 and 5 of his original petition. *See* # 19, n. 7.[2] On March 14, 2003, the respondent filed an Opposition to Petitioner's Memorandum in Support of Petition for Writ of Habeas Corpus (# 24).

## II. The Facts and the Procedural History [3]

On the evening of July 23, 1995, Janet Downing ("Downing") was stabbed to death in her Somerville home (# 24, p. 1). Downing was the mother of one of the petitioner's best friends, Ryan Downing ("Ryan") (*Id.* at p. 4). The petitioner and his family lived across the street from the Downings (*Id.*). The petitioner developed a preoccupation with Downing in the year before her death; he would watch her closely, sometimes through a telescope (*Id.*).

During a conversation the evening of July 22, 1995, the petitioner told Ryan of his desire to hurt someone (# 24, p. 4). Later that same evening, three boys arrived at the Downing home looking for Ryan; they knocked at the front door of the Downing home, but there was no answer (*Id.*). One of the boys heard a loud noise coming from the back yard, as if something were falling through tree branches (*Id.*). Another boy walked to the top of Hamlet Street, which bordered the Downing's back yard, and saw the petitioner crouching in some bushes and then saw him jump out onto Hamlet Street (*Id.*).

Ryan arrived home at about 10:00 p.m. and found his mother lying lifeless on the dining room floor (*Id.* at p. 5). He ran across the street to the O'Brien home to ask for help, and the petitioner's father called the police who began arriving within one minute (*Id.*).

In the meantime, the petitioner entered the Midnite Convenience store, a short distance from the Downing home, and told the clerk that he had been robbed (*Id.*). The petitioner was bleeding from cuts on his hands, had cuts and scrapes on his legs and appeared distraught (*Id.*). The petitioner was taken to the hospital, and two police officers went to the hospital to interview him (*Id.*). The police officers asked the petitioner's father, who was at the

2. Because the petitioner has waived argument on four of the seven grounds of his petition, there are only three grounds remaining (i.e., Grounds 1, 6 and 7). To prevent confusion, the grounds will be referred to herein with their original numbers rather than with new numbers. That is, they will be addressed in this Report and Recommendation as Ground 1, Ground 6 and Ground 7.

3. The petitioner's recitation of the facts and procedural history is set out at pp. 1–7 of the Memorandum of Law in Support of Petition for Writ of Habeas Corpus (# 19), and the respondent's version is at pp. 1–6 of his Opposition to Petitioner's Memorandum in Support of Petition for Writ of Habeas Corpus (# 24). I hereby adopt the version of the facts recounted by the Supreme Judicial Court ("SJC") in *Commonwealth v. O'Brien*, 432 Mass. 578, 736 N.E.2d 841 (2000). I presume all of those facts to be true as I must pursuant to 28 U.S.C. § 2254(e)(1). For the purposes of brevity, I restate herein only those facts that are relevant for purposes of issuing a Report and Recommendation on the instant petition and often quote the facts verbatim. (Citations are to the respondent's memorandum # 24, unless otherwise noted, rather than to the underlying decision by the SJC).

hospital, if they could interview the petitioner (*Id.*). The petitioner's father first spoke with the petitioner alone and they then agreed that the petitioner would speak to the officers about the crime (i.e., the robbery) he had reported (# 24, p. 5). The petitioner and his father consented to the officers' request to take his clothes and a swabbing of the blood on his right shin (*Id.*). The petitioner and his father also agreed to bring the petitioner's clothes to the police station and to show the officers where the robbery took place (*Id.*). They went to the place where the petitioner said he had been robbed, and the officers looked for blood and signs of a struggle, but found neither (*Id.*).

Shortly after he arrived at the police station with his father, at about 1:15 a.m. on July 24, the petitioner was advised of his Miranda rights by a police officer (*Id.*). The petitioner and his father signed a juvenile Miranda warning-waiver form (*Id.*). The petitioner repeated his account of the robbery but was unable to explain the scratches on his arms and legs (*Id.*). Toward the end of the interview, the petitioner was asked if he or any of the other boys he was friendly with had been involved in Downing's murder, and the petitioner denied any involvement (*Id.* at pp. 5–6). The petitioner and his father left the police station that night (*Id.* at p. 6). He was arrested on July 25, 1995 (*Id.*).

An autopsy revealed that Downing sustained sixty-six stab wounds and thirty-two incised wounds, and the cause of death was determined to be a loss of blood due to multiple stab wounds (# 24, p. 6). The petitioner's fingerprints were found in blood on the inside of the Downing's front door and on a wooden post in the cellar (*Id.*). A knife hilt found on a stair in the front foyer of the Downing home was identical in size to that of a knife owned by the petitioner that the police found in his trash, and he was known to have two such

knives (*Id.*). Blood consistent with that of the petitioner and having a profile shared by approximately six percent of the Caucasian population was found in the front hallway of the Downing home (*Id.*). DNA test results indicated that blood samples recovered from the Downing home matched the petitioner's blood sample (*Id.*). The blood taken from the petitioner's shin at the hospital was the same type as Downing's (*Id.*). Police also saw a trail of blood on Hamlet Street behind the Downing home and continuing about 500 feet along the route the petitioner followed on the evening of July 23, 1995 (*Id.*).

On July 26, 1995, a juvenile complaint issued from the Somerville district court charging the petitioner with Downing's murder (*Id.* at p. 1). A month later, on August 24, 1995, a Middlesex County grand jury indicted the petitioner for murder in the first degree (# 24, p. 1).

On February 6, 1996, the district court, after a transfer hearing, ordered that the petitioner be tried as a juvenile and not be transferred to the Superior Court (*Id.* at p. 2). On December 6, 1996, the SJC, ruling on an appeal by the Commonwealth, reversed the order denying transfer and remanded the case to the district court for further proceedings (*Id.*).

On remand, the Commonwealth filed a motion requesting that the original transfer judge recuse himself from further involvement in the case (*Id.*). The judge denied the motion summarily, and the Commonwealth sought relief from a single justice of the SJC who referred the matter to the full bench (*Id.*). On March 3, 1997, the SJC ordered the chief justice of the district court to reassign the case to another judge to "eliminate controversies and unnecessary issues in further proceedings and in any appeal." (*Id.*).

The case was reassigned, and a second transfer hearing was held (*Id.*). On May

9, 1997, the district court ordered that the petitioner be bound over for trial in the Superior Court and tried as an adult (*Id.*). Thus, the juvenile complaint was dismissed, and the petitioner was arraigned in the Superior Court on May 20, 1997 (*Id.*).

On September 15, 1997, the petitioner's jury trial began, and on October 1, 1997, the petitioner was found guilty of first degree murder on the theory of extreme atrocity and cruelty (# 24, pp. 2–3). The petitioner was sentenced to life in prison (*Id.* at p. 3). On October 18, 2000, the SJC affirmed the conviction (*Id.*).

At the trial, the petitioner's defense was that the crime scene was contaminated and that there was significant evidence indicating that a third party committed the murder (# 19, p. 5). The petitioner established *inter alia* that Caucasian hairs were found on the victim's hand and on the staircase in the victim's home; such hairs could have originated from the victim or from her ex-husband (*Id.* at p. 6). The victim's ex-husband's blood had the same profile as the victim's so, according to the petitioner, wherever blood consistent with the victim's was found, it could also have originated from her ex-husband (*Id.*).

Moreover, the brother-in-law of the victim, Aristedes Ortiz ("Ortiz") had blood similar to the victim's and her ex-husband's such that Ortiz could also have been a source of the blood found in the cellar of the victim's home (*Id.*). Ortiz was seen immediately after the discovery of the victim's body attempting to cross police tape to get into the backyard of the victim's home to search for his car keys (# 19, p. 6). Although DNA material found on the hilt of the knife discovered at the crime scene indicated that there were two sources of DNA (a primary and a secondary source), the DNA from the primary source was consistent with the victim's DNA and not consistent with the petition-

er's DNA, and the DNA from the secondary source also was not consistent with the petitioner's DNA, indicating that it came from a third individual (# 19, p. 7; Assented to Motion for Leave to Correct Error in Memorandum in Support of Petition for Writ of Habeas Corpus # 25, p. 1).

At trial, the petitioner sought to show that Ortiz might have been the murderer (# 19, p. 9). He presented evidence that: Ortiz had lived in the victim's home until about four months before the murder; Ortiz could have been the source of blood found in the basement of the victim's home; Ortiz could have been the source of DNA material found on the hilt of the knife found at the crime scene; immediately after discovery of the victim's body, Ortiz tried to get past police tape to enter the victim's back yard to retrieve his keys; on the day of the murder, the victim had a conversation with a neighbor about Ortiz (*Id.*). The trial court precluded the petitioner from introducing evidence from Regina Mahoney ("Mahoney"), a neighbor of the victim, that: the victim had evicted Ortiz from her home for dealing drugs; the victim and Ortiz had a hostile relationship, in that they made threats to each other; the victim was in fear of Ortiz; and, on the day of her death, the victim expressed her fear of Ortiz to Mahoney (# 19, pp. 9–10).

### III. Analysis

Title 28 U.S.C. § 2254(d), the applicable habeas corpus statute, sets out that:

An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Feder-

al law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The petitioner has asserted that he is entitled to habeas relief based on three [4] separate grounds. Those grounds are as follows:

Ground 1: The state courts unreasonably applied established Federal law by failing to recognize that the petitioner's due process rights were violated where he was denied the opportunity to introduce evidence of a hostile relationship between the victim and a third party [Ortiz] (# 19, pp. 8–9);

Ground 6: The state courts unreasonably applied established Federal law by failing to recognize that the petitioner's federal constitutional rights against self-incrimination were violated where the transfer hearing judge drew numerous adverse inferences against the petitioner for failing to take part in treatment programs before trial (*Id.* at p. 14); and

Ground 7: The state court unreasonably applied established Federal law by failing to recognize that the petitioner's due process rights were violated where the first transfer judge was removed from the case (*Id.* at p. 19).

Because I will recommend that the petition be denied, I will address all of the grounds raised by the petitioner and explain why none provides a basis for habeas relief. In short, I must determine whether any of the state court legal determinations were "contrary to" or "unreasonable applications of" established Supreme

Court law.[5] In order to make such determinations, it is necessary first to set forth the applicable standards.

### A. Standards

#### 1. "Contrary to" Standard

The Supreme Court has explained that "a state court decision is 'contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" *Lockyer v. Andrade,* 538 U.S. 63, 123 S.Ct. 1166, 1173, 155 L.Ed.2d 144 (2003)(citing *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). In deciding whether the "contrary to" prong applied, the court in *Hurtado v. Tucker* stated that "this case presents a good example of one to which § 2254(d)(1)'s 'contrary to' prong does not apply: 'a run-of-the-mill state-court decision applying the correct legal rule from [the Supreme Court's] cases to the facts of a prisoner's case.'" 245 F.3d 7, 15 (1 Cir., 2001), *cert. denied,* 534 U.S. 925, 122 S.Ct. 282, 151 L.Ed.2d 208 (2001) (quoting *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495 (2000)).

#### 2. "Unreasonable Application of" Standard

The Supreme Court in *Williams* held that a state court decision would involve an 'unreasonable application of' clearly established Supreme Court precedent if it "identifies the correct governing legal principle from [the] Court's decisions

---

**4.** As discussed *supra,* the petitioner originally premised his petition on seven separate grounds, but subsequently waived four of those grounds.

**5.** The petitioner does not argue that the state court decisions were based on unreasonable determinations of fact in light of the evidence presented. Thus, I need not address 28 U.S.C. § 2254(d)(2).

but unreasonably applies that principle to the facts of the prisoner's case...." The Court also underscored that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law...." Indeed, because Congress used the word "unreasonable" in § 2254(d)(1), and not words like "erroneous" or "incorrect", a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

*Hurtado,* 245 F.3d at 15–16 (quoting *Williams,* 529 U.S. at 410–11, 120 S.Ct. 1495)(internal citations omitted)(emphasis in original).

The *Hurtado* court explained further that "the Supreme Court in *Williams* explicitly rejected the view...that an 'unreasonable application of' clearly established federal law requires that the application be one that *all* reasonable jurists would agree was unreasonable....Thus, the test is an objective one and not so stringent as to require that all reasonable jurists agree the state court decision was unreasonable." 245 F.3d at 17 (emphasis in original); *see also McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir.2002)(overruling *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998) and *Williams v. Matesanz,* 230 F.3d 421 (1st Cir.2000) in holding that for a state court determination to be considered an "unreasonable application" of federal law, there must be "some increment of incorrectness beyond error" such that the decision is considered unreasonable in the "independent and objective judgment of the federal court."). I must decide now whether any of the state court determinations in the petitioner's case were contrary to or unreasonable applications of established Supreme Court precedent.

## B. The Petitioner's Asserted Grounds for Habeas Relief

### 1. The "Hostile Relationship" Ground (Ground 1)

The petitioner argues that his due process rights were violated because he was denied the opportunity to introduce evidence of a hostile relationship between the victim and a third party, Ortiz (# 19, pp. 8–9). Specifically, the petitioner asserts that he was attempting to establish that Ortiz might have been the murderer and sought to present evidence from Mahoney that the victim had evicted Ortiz from her home for dealing drugs, that the victim and Ortiz had a hostile relationship, that the victim was in great fear of Ortiz, and that on the day of her death, the victim expressed her fear of Ortiz to Mahoney (*Id.* at pp. 9–10). The trial court precluded the petitioner from presenting such evidence but did allow the petitioner to offer other evidence about Ortiz. The gist of the petitioner's argument is that the due process clause guaranteed the petitioner the right to present to a jury his version of the facts-to wit, that Ortiz had the motive and opportunity to have committed the crime and that his attempt to remove evidence (i.e., his keys) from the crime scene in the immediate aftermath of the discovery of the victim's body was evidence of consciousness of guilt (# 19, pp. 13–14).

As mentioned above, the petitioner was precluded by the trial court from presenting evidence from Mahoney about the alleged hostile relationship between the victim and Ortiz. The SJC upheld the trial court's decision, ruling that:

> The judge correctly excluded the evidence as hearsay....We have suggested that hearsay may be admitted, in the judge's discretion, to show that a third party might have committed the crime for which the defendant is being tried provided the evidence is otherwise rele-

vant, will not tend to prejudice or confuse the jury, and there are other "substantial connecting links" to the crime. . . .

Mahoney's testimony would have no tendency to prove that Ortiz was actually the murderer, and would be confusing as no more than an opinion of Ortiz's involvement. . . Mahoney testified that Ortiz appeared at the crime scene and crossed the police crime scene tapes looking for a set of keys. There was forensic evidence that Ortiz's blood (a sample of his blood was obtained) had some similarities with the victim's blood, so he could not be excluded as a source of blood found in the Downing home. (The same is true of the victim's former husband.) However, Mahoney also testified that she never saw any cuts, scratches, or blood on Ortiz that night, so it was unlikely that any blood at the scene was Ortiz's. There are insufficient connecting links between Ortiz and Downing's murder from which it might be argued that he killed her. The judge did not abuse his discretion in excluding the hearsay testimony of the conversation between the victim and Mahoney. Justice does not require a different result.

*Commonwealth v. O'Brien,* 432 Mass. 578, 588–89, 736 N.E.2d 841, 851–52 (2000)(internal citations omitted).

In sum, the petitioner contends that the SJC's action in upholding the trial court's preclusion of testimony regarding the relationship between Ortiz and the victim "constituted an unreasonable application of the Supreme Court's rulings in *Washington v. Texas* . . . and *Chambers v. Mississippi* . . .that a defendant's due process right to present a defense cannot be thwarted by a mechanistic (or otherwise unreasonable) application of evidentiary rules." (# 19, p. 14). Not surprisingly, the respondent disagrees with the petitioner, asserting that the SJC's decision was nei-

ther contrary to, nor an unreasonable application of, established federal law because neither *Washington* nor *Chambers* stands for the proposition urged by the petitioner-that "the Constitution requires state courts to admit any evidence that is helpful to the defense, regardless of its reliability or probative value." (# 24, p. 12).

The obvious starting point for an analysis of Ground 1 is a review of the *Washington* and *Chambers* cases, relied on by the petitioner. In *Washington v. State of Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Supreme Court held that the petitioner was "denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness [i.e., a co-participant in the crime] who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." The *Washington* court stated that the Constitution is violated "by arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of a priori categories that presume them unworthy of belief." 388 U.S. at 22, 87 S.Ct. 1920. Similarly, in *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the Supreme Court held that the exclusion of testimony from those who had heard a third party confess to the murder at issue, coupled with the State's refusal to permit the petitioner to cross-examine the party who made the confessions, denied the petitioner "a trial in accord with traditional and fundamental standards of due process."

I agree with the respondent that the case at bar differs drastically from *Washington* and *Chambers,* in that "those decisions turned on the ineluctable reliability of the excluded evidence." (# 24, p. 11) In

*Washington,* the excluded testimony was from a co-participant in the crime who would have testified that he fired the fatal shot and who "was the only person other than petitioner who knew exactly who had fired the shotgun and whether petitioner had at the last minute attempted to prevent the shooting." 388 U.S. at 16, 87 S.Ct. 1920. Likewise, in *Chambers,* the trial court refused to allow testimony from witnesses to whom a third party confessed to the crime at issue and also refused to permit the petitioner to cross-examine the third party who made the confessions. Interestingly, were it not for the state statutes in *Washington* and *Chambers* barring testimony from co-participants (*Washington*) and not permitting one who calls a witness to attack his credibility, the so-called "voucher" rule (*Chambers*), the evidence in the two cases would not have been excluded on hearsay grounds. In *Washington,* the witness was an eyewitness who would have presumably testified from personal knowledge. In *Chambers,* the excluded evidence involved confessions made by the witness which were inconsistent with his trial testimony. The evidence of confessions would have been statements against the witness' interest, as well as prior inconsistent statements. But since Chambers was the party who called the witness to the stand, he could not impeach him.

In marked contrast, in the instant case, the court did not preclude evidence that Ortiz confessed to the murder or testimony (from him or others) that he actually committed the crime; the court only prohibited hearsay testimony which suggested that the victim and Ortiz had a volatile relationship and that the victim was afraid of Ortiz. Here, the testimony from Mahoney did not have the same indicia of reliability as the testimony in the two Supreme Court cases relied on by the petitioner. And, as noted by the respondent, unlike in *Washington* and *Chambers,* the actual de-

clarant in this case (i.e., the victim) obviously was not available to testify and be cross-examined and further the out-of-court statements purportedly made by the victim to Mahoney were not corroborated in any way. The case at bar simply does not fall within the purview of the *Washington* and *Chambers* rules. Put another way, in the instant case, the trial court did not exclude evidence that would have tended to exonerate the petitioner or establish that a third party committed the murder; it simply decided not to allow hearsay testimony of questionable reliability that would have, at most, provided some evidence that the victim and Ortiz had a hostile relationship.

While another trial court might have, within its discretion, allowed in the testimony regarding the relationship between the victim and Ortiz, that the trial court decided in this case to preclude such evidence was not contrary to, nor an unreasonable application of, established Supreme Court law. Thus, I will not recommend that a writ of habeas corpus issue on the basis set forth in Ground 1.

### 2. The "Self–Incrimination" Ground (Ground 6)

The petitioner asserts that his Fifth Amendment right against self-incrimination was violated when the transfer judge drew numerous adverse inferences against him for failing to take part in treatment programs before trial (# 19, p. 14). The petitioner contends that "[a]lthough the transfer judge explicitly stated that he did not draw any adverse inferences against O'Brien for choosing not to make statements about the charges against him," he did nevertheless "draw several adverse inferences against O'Brien for his failure to take part in treatment programs while he was in custody pending trial...." (# 19, p. 15). The adverse inferences purportedly drawn by the transfer judge were that:

- "a small group of inmates which O'Brien had 'tended to associate with,' tended to be 'suspicious, antagonistic and contemptuous of clinical services;'"
- O'Brien "'has consistently not voiced any need or desire for treatment'";
- O'Brien "had not expressed recognition of the value of clinical services for himself, and had 'neither voiced nor exhibited apparent motivation to change'";
- O'Brien had a "'lack of apparent motivation for treatment' and 'his lack of any overt signs of, recognition of,...anxiety about, or...other emotional distress occasioned by, any problem or inadequacy he may perceive in himself'" militated against successful rehabilitation; and
- "identification of O'Brien's internal issues 'is not even close,' and that O'Brien has shown no motivation for involvement in nor recognition of any potential value in the volunteer programs that would be necessary for such identification."

(# 19, pp. 16–17).

The gist of the petitioner's argument is that based on the transfer court's inferences, he was in a dilemma-that is, despite his protestations of innocence, he risked being tried as an adult and being subjected to a longer sentence unless he admitted before trial that he needed treatment, was motivated to receive treatment and to change and that he was motivated to become involved in the volunteer programs that were necessary to identify his "internal issues." (# 19, p. 16). In other words, the petitioner, according to him, was in the untenable "Catch 22" situation of either continuing to assert his innocence and refusing treatment with the consequence of being tried as an adult because he opted out of treatment *or* agreeing to undergo treatment in the hopes that he would be tried as a juvenile which would mean that he had to admit that he had "issues" that needed to be addressed; such an admission would be contrary to his assertions of innocence. In short, the petitioner argues that he suffered directly "because he exercised his constitutional right to avoid making communications (through statements or actions) that were inculpatory." (# 19, p. 17).

The respondent contends, on the other hand, that the "Fifth Amendment forbids the government from drawing adverse inferences from a defendant's post-arrest right to remain silent" and that the "transfer judge plainly based his findings on O'Brien's post-arrest behavior and voluntary statements, *not on his silence*." (# 24, pp. 20–21)(emphasis added). Even from a cursory review of the petitioner's argument, it appears that the respondent is correct that the transfer judge based his decision on the petitioner's behavior, not on his silence. For example, the transfer judge, in determining that the petitioner should be tried as an adult, found that he associated with a group of inmates who were suspicious of clinical treatment, that he did not voice a need for treatment, and that he was not motivated to participate in treatment or volunteer programs. It was not that the transfer judge was drawing negative inferences from the petitioner's refusal to talk; to the contrary, the transfer judge was assessing O'Brien's amenability to rehabilitation based on his behavior toward treatment and counseling while incarcerated.

The SJC's affirmance of the transfer judge's decision fully supports the position that the transfer judge based his findings on O'Brien's actions, not on his silence:

The District Court judge expressly and meticulously disavowed any consideration of any assertion by the [petitioner]...of his right to remain silent. The

[petitioner] attempts to show that notwithstanding that disavowal[,]the District Court judge went ahead and considered the [petitioner's] assertion of his right to remain silent. He cites such findings by the judge as "he does not voice any need or desire for treatment"; "he has neither voiced nor exhibited apparent motivation to change"; "his lack of apparent motivation for treatment; his lack of any overt signs of recognition of, or anxiety about, or of other emotional distress occasioned by, any problem or inadequacy he may perceive in himself"; and "he has shown no motivation for . . . involvement [in voluntary rehabilitation programs]." Implicit in this argument is the premise that the District Court judge could have made such findings *only* by drawing adverse inferences from the [petitioner's] exercise of his right to remain silent. There is no basis for such a premise, and the record supports the contrary view. . . . The judge's findings were not based on the [petitioner's] exercise of his right to remain silent, but on the [petitioner's] failure to see any value in any treatment programs. The findings also were based on the [petitioner's] conduct at the facility where he was held and the peer group with which he chose to associate.

*O'Brien,* 432 Mass. at 584–85, 736 N.E.2d at 849.

In conclusion, while the petitioner may not have liked the so-called "dilemma" in which he found himself regarding treatment, the actions of the transfer judge in assessing the petitioner's amenability to rehabilitation based on the petitioner's decision not to undergo treatment were not contrary to nor an unreasonable application of established Supreme Court precedent. The petitioner had a Fifth Amendment right to remain silent; he also had

the right to refuse to participate in treatment.[6] Moreover, the transfer judge, in determining whether the petitioner should be tried as a juvenile or as an adult, had the right to take into consideration the actions and behavior of the petitioner. Nothing that the transfer judge did in assessing the petitioner's behavior contravened Supreme Court law. Thus, Ground 6 does not provide a basis for habeas relief.

## 3. The Removal of the Transfer Judge (Ground 7)

The final ground relied on by the petitioner is that the "state court unreasonably applied established Federal law by failing to recognize that the petitioner's due process rights were violated" because the first transfer judge was removed from the case (# 19, p. 19). The petitioner bases this due process argument on the fact that the order used to remove the first transfer judge stated that the "assignment of a new judge . . . will eliminate controversies and unnecessary issues in further proceedings and in any appeal." (*Id.*). According to the petitioner, the SJC's reasoning was flawed because "the removal of a transfer judge in the context of a murder case would do nothing to 'eliminate controversies'" and the SJC's removal of the first judge did not eliminate unnecessary issues on appeal but actually guaranteed "an unnecessary issue on appeal-the issue of its intrusion into the case by removing the judge that had been assigned to decide whether O'Brien was to be tried as an adult." (*Id.* at p. 20). Moreover, asserts the petitioner, the SJC's action in removing the first transfer judge "was an unreasonable manipulation of the system to remove from the case a judge that the Commonwealth was concerned would rule in O'Brien's favor." (# 19, p. 21).

**6.** I note that from a purely practical point of view, it seems that the petitioner could have

undergone treatment while still maintaining his innocence.

The petitioner's argument is not explained in particularly clear terms, nor is it supported by case law. Indeed, the only case cited by petitioner here is *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); the petitioner apparently relies on this case for the proposition that "[r]egard for the requirements of the Due Process Clause inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses...." *Rochin,* 342 U.S. at 169, 72 S.Ct. 205 (internal citations and quotation marks omitted). It can be inferred that the petitioner believes that under *Rochin,* the SJC's actions in removing the first transfer judge offended "canons of decency and fairness" such that his due process rights were violated.

The respondent contends, on the other hand, that Ground 7 does not provide a basis for habeas relief because: (1) "when the SJC rejected this argument below, it relied on independent and adequate state-law grounds"; and (2) "O'Brien has failed to identify any Supreme Court precedent which supports his...claim that reassignment of his case to another judge violated the Due Process Clause." (# 24, p. 25). In ruling on O'Brien's appeal, the SJC stated, with regard to the issue of the removal of the transfer judge, that:

for the reasons stated in our removal order, intervention became necessary in the interest of justice. No defendant, indeed, no person, has a vested interest in having a particular judge assigned to his case. We left the assignment to the Chief Justice of the District Court Department of the Trial Court. From that substitution, what the defendant could expect and what he was entitled to receive was a fair transfer hearing. He was entitled to no more.

*O'Brien,* 432 Mass. at 584, 736 N.E.2d at 849.

■ O'Brien has failed utterly to establish that the removal of the first transfer judge violated his due process rights; indeed, he points to no Supreme Court case standing for the proposition that removal of a judge presiding over a transfer hearing (or any hearing) violates a defendant's due process rights. In the only case he relies on-*Rochin*-the Supreme Court held that the actions of deputy sheriffs in forcibly removing pills from the stomach of a man they had arrested violated his due process rights. 342 U.S. at 173, 72 S.Ct. 205. Clearly, the *Rochin* case has no bearing on the petitioner's case here. Therefore, given that the petitioner has provided no federal law supporting his argument that the removal of the transfer judge violated his due process rights, it cannot be said that the SJC's actions in affirming the removal of the transfer judge were an unreasonable application of, or contrary to, established Supreme Court precedent.[7] Thus, Ground 7, like Grounds

7. Because I find that the SJC's actions in this situation were not an unreasonable application of, or contrary to, established Federal law, I need not address the respondent's argument that the SJC relied on an adequate and independent state ground when it denied the petitioner's due process challenge. However, to foreclose potential further inquiry, I find that the SJC did rely on an adequate and independent state ground when it denied the

petitioner's appeal on the issue of the removal of the transfer judge.

Briefly stated, the original transfer judge decided that the petitioner should be tried as a juvenile (# 24, p. 25). On interlocutory appeal, the SJC found that the original transfer judge had committed numerous errors during the transfer hearing and in his written decision (*Id.*). When the original judge re-

1 and 6, does not provide the petitioner with a basis for habeas relief, and I must, therefore, recommend that the petition for writ of habeas corpus be denied.

### IV. Recommendations

For the reasons stated, I RECOMMEND that the petitioner's petition for writ of habeas corpus (# 1) be DENIED.

### V. Review by the District Judge

The parties are hereby advised that pursuant to Rule 72, Fed.R.Civ.P. any party who objects to this recommendation must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed.R.Civ.P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services,* 848 F.2d 271 (1st Cir.1988); *United States v. Emiliano Valencia–Copete,* 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor*

fused to recuse himself or make written findings on the Commonwealth's recusal motion, the Commonwealth asked a single justice of the SJC to remove him pursuant to M.G.L. c. 211, § 3 (*Id.*). After consideration by the full bench, the SJC ordered the chief justice of the district court to reassign the case to another judge (*Id.*). Then, the SJC denied the petitioner's appeal because its order removing the original transfer judge was "final and [was] not subject to review in this appeal." (*Id.*)(citing *O'Brien,* 432 Mass. at 583, 736 N.E.2d at 848). This ruling constituted an adequate and independent state law ground such that any habeas review should be precluded.

*Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

May 6, 2004.

Simply stated, the SJC did not rely on any interpretation of federal law in denying the petitioner's appeal-instead, it clearly applied state procedural law and based its decision on the fact that the order removing the first transfer judge was "not subject to review" on appeal. *See Michigan v. Long,* 463 U.S. 1032, 1044, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (holding that "in the absence of a plain statement that the decision below rested on an adequate and independent state ground," the federal court has jurisdiction to address a federal issue considered by the state court.); *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)(stating that "plain statement" rule applies in habeas cases, as well as on direct review).