# United States Court of Appeals

## For the First Circuit

No. 05-2512

EDWARD S. O'BRIEN,

Petitioner, Appellant,

v.

JOHN MARSHALL, SUPERINTENDENT,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Boudin, Chief Judge,

Lynch and Howard, Circuit Judges.

Edward B. Gaffney for petitioner.
Eva M. Badway, Assistant Attorney General, Criminal Bureau,
with whom Thomas F. Reilly, Attorney General, was on brief for
respondent.

June 27, 2006

**BOUDIN, Chief Judge**. Edward O'Brien was convicted of first-degree murder in Massachusetts state court and sentenced to life in prison. After affirmance by the Massachusetts Supreme Judicial Court ("SJC"), Commonwealth v. O'Brien, 736 N.E.2d 841, 854 (Mass. 2000) ("O'Brien I"), O'Brien petitioned for a writ of habeas corpus, which was denied, O'Brien v. Marshall, 384 F. Supp. 2d 501, 504 (D. Mass. 2005) ("O'Brien II"). O'Brien now appeals the district court's denial of his habeas petition.

We recite the background facts as determined by the state court. 28 U.S.C. § 2254(e)(1) (2000). On the evening of July 23, 1995, Janet Downing was stabbed to death in her home in Somerville, Massachusetts. O'Brien, who was 15 years old at the time, lived across the street from Downing and was close friends with her son, Ryan Downing. During the year preceding Downing's death, O'Brien had developed a preoccupation with her.

At about 9:20 p.m. on the day of the murder, three boys went to the Downing house to look for Ryan. After they knocked at the front door and received no answer, one of the boys heard a loud noise coming from the backyard, which sounded as if someone was falling through tree branches. O'Brien was discovered crouching in bushes nearby, and, ignoring calls from two of the boys, O'Brien--laughing and with fists clenched and eyes bulging--walked away.

Ryan Downing, returning home at around 10 p.m., found his mother lying on the dining room floor; it was later established

that she had been killed by stabbing, there being 66 stab wounds and 32 slashes on her body. At about the same hour, O'Brien entered a store near Union Square in Somerville where he worked on a part-time basis; he was bleeding from cuts on his hand and had other cuts and scrapes on his leg, and he claimed to have been robbed and stabbed in Union Square.

The police were called and later took O'Brien--with his father--to the scene of the alleged robbery in Union Square. It proved to be a busy and well-lit area with no signs of struggle or blood. Later, O'Brien's fingerprints were found in blood on the inside of the front door of the Downing's house and on a wooden post in the cellar. A knife hilt found in the Downing's house matched that of a knife owned by O'Brien that police found in his trash (and he was known to have owned two such knives).

Blood consistent with O'Brien's, with a profile shared by six percent of the Caucasian population, was found in the front hallway of the Downing home. DNA tests indicated that blood from the front door, dining room door, and a dress in the cellar matched O'Brien's blood sample. Blood taken from O'Brien's right shin matched Downing's blood type. Police also saw a trail of blood on the street that corresponded to the route O'Brien had followed when his friends witnessed his departure from the Downing house.

On August 24, 1995, O'Brien was indicted by a Middlesex County grand jury for first-degree murder. In order to try O'Brien

as an adult, the Commonwealth had to prove, by a preponderance of the evidence, that he was "a significant danger to the public and . . . not amenable to rehabilitation within the juvenile justice system." Mass. Gen. Laws ch. 119, § 61 (1994).[1] If tried as an adult, O'Brien faced a mandatory life sentence, id. ch. 265, § 2; if treated as a juvenile, the maximum sentence was 20 years, id. ch. 119, § 72.

After an initial transfer hearing, the state-court district judge ordered O'Brien to be tried as a juvenile, but this decision was reversed by the SJC, Commonwealth v. O'Brien, 673 N.E.2d 552 (1996); a new judge held a second transfer hearing and ordered O'Brien to be tried as an adult. After a two-week trial in the fall of 1997, a jury found O'Brien guilty of first-degree murder, based on extreme atrocity and cruelty, and he was sentenced to life in prison. He appealed to the SJC, which affirmed. O'Brien I, 736 N.E.2d at 854.

In January 2002, O'Brien filed his federal habeas petition, raising both Fifth Amendment and due process issues. The district court denied the petition. We review the district court's legal conclusions de novo, Almanzar v. Maloney, 281 F.3d 300, 303

---

[1]The statute created a rebuttable presumption that a juvenile charged with murder is dangerous to the public and not amenable to rehabilitation. Id. § 61. If the juvenile met an initial burden of producing evidence to the contrary, the burden shifted to the state, which then had to prove its case by a preponderance of the evidence. Commonwealth v. Wayne W., 606 N.E.2d 1323, 1326 (Mass. 1993).

(1st Cir. 2002), cert. denied, 537 U.S. 817 (2002), but must respect the SJC's conclusions on federal constitutional issues adjudicated by the SJC unless they "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

Both sides assume that the SJC did resolve at least in some aspects both the Fifth Amendment and due process claims. This is clear enough as to one claim, less clear as to the other; but it does not matter, because the result would be the same whether we deferred to the SJC or reviewed O'Brien's constitutional claims de novo, as we would do with a claim properly presented to the SJC but not in fact decided by it. Goodrich v. Hall, 448 F.3d 45 (1st Cir. 2006).

O'Brien's Fifth Amendment claim is that in the transfer proceeding that led to his subsequent trial as an adult, the state court judge relied upon O'Brien's silence in deciding that O'Brien was "not amenable to rehabilitation within the juvenile justice system." Mass. Gen. Laws ch. 119, § 61. The reliance, according to O'Brien, is shown by several of the findings on which the state judge relied in concluding that O'Brien was not so amenable; in particular, that

> - he "has consistently not voiced any need or desire for treatment";

- he had "neither voiced nor exhibited apparent motivation to change"; and

- he lacked "any overt signs of, recognition of, . . . anxiety about, or . . . other emotional distress occasioned by, any problem or inadequacy he may perceive in himself."

The state judge relied on other findings as well--for example, that O'Brien "tended to associate with" inmates who were "suspicious, antagonistic and contemptuous of clinical services" and that he had "a lack of apparent motivation for treatment." But we will assume that the refusal to transfer was in part based on inferences about his make-up drawn from his failure to say or do things suggesting a desire for rehabilitation.

In affirming, the SJC said that the judge's findings "were not based on the defendant's exercise of his right to remain silent, but on the defendant's failure to see any value in any treatment programs." O'Brien I, 736 N.E.2d at 849. The district court agreed, saying that the transfer judge based his decision on O'Brien's behavior, not his silence, and thus was not "drawing negative inferences from the petitioner's refusal to talk." O'Brien II, 384 F. Supp. 2d at 512.

True enough, the transfer court did not infer guilt from silence; but it did in some measure rely on O'Brien's refusal to express a need for treatment in concluding that he was not likely to be rehabilitated. True, too, those assessing him were not supposed to inquire about the crime; but, O'Brien argues, an

-6-

inference could perhaps be drawn, if he confessed to a need for treatment, that the confession rested on his commission of the crime.

If the transfer hearing were treated as a criminal trial, the sequence would raise problems that would need careful consideration. What happened does not conflict with the bare language of the Fifth Amendment, which provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V; but neither the literal language nor the history of the amendment is a safe guide to its full modern reach.[2]

However, in Estelle v. Smith, 451 U.S. 454 (1981), the Supreme Court said that the Fifth Amendment did not apply in a state court hearing to determine whether the defendant was competent to stand trial--so long as the evidence (information obtained by a psychiatrist without a Miranda warning) was used only for the competency hearing. Id. at 465. Although dicta, the statement was explicit and undermines O'Brien's premise that the hearing should be equated to a criminal trial.

---

[2]E.g., Miranda v. Arizona, 384 U.S. 436, 460-61 (1966) (police station questioning); Slochower v. Bd. of Higher Educ. of City of New York, 350 U.S. 551, 557-59 (1956) (employment qualifications). Compare Wigmore on Evidence § 2252 (McNaughton rev. 1961) (describing the history of the privilege), with Griffin v. California, 380 U.S. 609, 615 (1965).

Juvenile court transfer hearings closely parallel competency hearings. Neither resolves questions of substantive guilt or innocence; each addresses "whether a defendant should be exempted from criminal prosecution because he falls within a category of persons who, in the eyes of the law, are not viewed as fully responsible for their acts." United States v. A.R., 38 F.3d 699, 703 (3d Cir. 1994). The Third Circuit and the Ninth Circuit have applied Estelle to juvenile transfer hearings, A.R., 38 F.3d 702-04; United States v. Mitchell H., 182 F.3d 1034, 1035-36 (9th Cir. 1999), and we agree with our sister circuits.

Although it is sometimes said that a defendant's silence or refusal to cooperate cannot be used to his disadvantage, this is a misstatement of the privilege.[3] Just as too literal a reading understates the protection now afforded, such a loose colloquial description overstates it. Given Estelle, we hold that the Fifth Amendment did not preclude the state court judge from taking account of O'Brien's attitude, whether or not characterized as silence, in determining that he was not likely to be rehabilitated and should instead be tried as an adult.

---

[3]E.g., Baxter v. Palmigiano, 425 U.S. 308 (1976) (adverse inference in prison disciplinary hearing); California v. Byers, 402 U.S. 424 (1971) (failure to stop at scene of accident statute); Baltimore Dept. of Social Servs. v. Bouknight, 493 U.S. 549 (1990) (failure to produce injured child); United States v. O'Brien, 435 F.3d 36 (1st Cir. 2006) (impeachment by pre-arrest silence).

The SJC has elsewhere taken the view that the privilege applies in transfer hearings. Wayne W., 606 N.E.2d at 1330. Just what Wayne meant may be uncertain: confusion readily arises in privilege cases where evidence (or silence) occurs in one forum--here, the transfer proceedings--but its contested use may relate either to the same proceeding or to a different forum (e.g., a later trial). Our immediate concern is with use of O'Brien's silence in the transfer proceeding, as to which we think Estelle's dictum is clear.

Illustrating this distinction, O'Brien also appears to make a related but different argument. In addition to directly attacking the use of his silence as an impermissible basis for his transfer to adult status, he argues that the transfer punished him (by denial of juvenile status) for exercising his constitutional right to refrain from making self-incriminating statements that could have been used against him to establish his guilt at the criminal trial.

In Estelle, the Supreme Court assumed that there well might be a problem if incriminating information, extracted involuntarily from the defendant in a competency hearing, were then to be used against him in a criminal trial. 451 U.S. at 468-69. For federal juvenile transfer hearings, the statute provides formal protection against this risk. 18 U.S.C. § 5032 (2000). A comparable privilege was created by the Supreme Court for

-9-

suppression hearings.  <u>Simmons</u> v. <u>United States</u>, 390 U.S. 377, 393 (1968).

The problem may often not arise in Massachusetts practice where the juvenile is not supposed to be questioned about his guilt at all in the transfer evaluation.  Nevertheless, where the fifth amendment privilege applies, compulsion to secure an admission can be barred even though the evidence has only a remote likelihood of implicating the defendant in the specific crime.  <u>Hoffman</u> v. <u>United States</u>, 341 U.S. 479, 486-88 (1951).  So, O'Brien may be right in saying that the prosecution at the criminal trial could have been aided by O'Brien's explanations as to why he needed treatment, if he had made such admissions in the transfer hearing evaluations.

Here, it is enough to reject O'Brien's alternative claim that he never asked the court to protect him against the contingent threat that he now asserts.  It would have been easy enough for O'Brien to say to the transfer court that he wanted to make statements to the therapists helpful to his position; that he feared the use of such information at trial; and that he wanted an <u>in limine</u> ruling that he could make these statements in opposing transfer but would be protected against their use against him at trial.

We have no idea how such a motion would have been handled:  the prosecutor might have agreed, or the court might have made a protective ruling, or O'Brien's claim of need to make

incriminating statements might have been explored and found wanting.[4]  However, there is no indication that O'Brien ever sought any such protection, nor does O'Brien appear to have raised this argument directly before the SJC.  Under these circumstances, we do not think that his argument was properly preserved or is fairly before us.  Martens v. Shannon, 836 F.2d 715, 717 (1st Cir. 1988).

O'Brien's due process claim--perhaps more sympathetic on the facts but not much stronger in law--is that at trial the state court denied him due process by refusing to admit certain evidence. The evidence in question did not directly counter any of the pieces of powerful evidence against O'Brien--presence, motive, behavior, blood and the knife.  Rather, it was intended to suggest that another person could have committed the crime.

The other person was Aristedes Ortiz.  At trial, O'Brien was allowed to show that Ortiz was Janet Downing's brother-in-law and had lived in her home with his family until about four months before the murder; that he could have been the source of blood found in the victim's house and on the knife hilt; and that

---

[4]In Wayne W., the Massachusetts prosecutor took almost this position on appeal to the SJC.  606 N.E.2d at 1330.  As for a protective ruling, the SJC earlier said in dictum, Commonwealth v. Ortiz, 471 N.E.2d 1321, that the statute did not create such a privilege against later use, but the Ortiz holding leaned heavily against waiver of the trial privilege by testimony in the transfer proceeding, and the privilege could also be created by courts. E.g. Simmons, 390 U.S. at 393.

immediately after the victim's death, he attempted to get past police tape to the victim's backyard in order to retrieve his keys.

The court also allowed O'Brien to prove that on the day of the murder, Downing had had a conversation with a neighbor about Ortiz. The court, however, did not allow the neighbor's testimony as to certain facts allegedly learned from Downing--namely, that Downing had evicted Ortiz from her home for dealing drugs; that there was a hostile relationship between them including "threats back and forth"; and that Downing feared Ortiz and had said so to the neighbor on the day of the murder.

The state court judge excluded the statements as inadmissible hearsay.[5] On appeal, the SJC said that the testimony sought to be admitted "would have no tendency to prove that Ortiz was actually the murderer, and would be confusing as no more than an opinion of Ortiz's involvement," and that given the "insufficient connecting links between Ortiz and Downing's murder," the judge did not abuse his discretion or act unjustly in excluding the evidence as hearsay. O'Brien I, 736 N.E.2d at 852.

In relevant part, the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to

---

[5]The statements, offered for their truth, are classic hearsay, since the neighbor had no personal knowledge of relations between Ortiz and Downing. Downing's statement of her own fear might or might not be admissible in some courts under a hearsay exception, e.g., Fed. R. Evid. 803(3), the causes of the alleged fear are what mattered in this case.

-12-

have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. Together with the Sixth Amendment's "confrontation" clause, the "compulsory process" language has been deployed by the Supreme Court in recent years to police evidence law in state courts. O'Brien was not denied the use of compulsory process, but, as with the Fifth Amendment, precedent goes somewhat beyond the language and history of the clauses.

Yet, the Supreme Court has also made clear that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."[6] Indeed, much of the language used in the cases and most of the results suggest that something like a classic due process balancing is at play--namely, that federal rights are violated only when state rules or particular results are shocking or indefensible. The key Supreme Court cases overturning the exclusion of exculpatory evidence bear out the view that a kind of ad hoc balancing is at work but the threshold is high.

Thus, in Washington v. Texas, 388 U.S. 14 (1967), the trial court had excluded exculpatory testimony from an accomplice even though he "was the only person other than [the defendant] who knew exactly who had fired the shotgun" and who would have

---

[6]United States v. Scheffer, 523 U.S. 303, 308 (1998). Accord Crane v. Kentucky, 476 U.S. 683, 690 (1986); see also Holmes v. South Carolina, 126 S. Ct. 1727, 1731 (2006) (violation only when such rules are "arbitrary or disproportionate to the purposes they are designed to serve").

-13-

testified that he, rather than the defendant, had fired the fatal shot. 388 U.S. at 16. The state court's basis for excluding the testimony was a flat state ban on the defense's use of accomplice testimony, id. at 16-17, which the Supreme Court found to be arbitrary, id. at 22-23.

Similarly in Chambers v. Mississippi, 410 U.S. 284 (1973), the Supreme Court said that a defendant in a murder case had to be allowed to offer evidence that someone else had confessed to the crime to three separate individuals on three separate occasions. Id. at 292-93, 302. Such confessions, although obviously against interest, are viewed with some suspicion under classic hearsay law when offered to exculpate someone else; but in Chambers these confessions looked very reliable, id. at 300-01, and Mississippi law precluded the defendant even from cross-examining the person who had made the confessions. Id. at 295.

As we have previously noted, the Supreme Court has "rarely" overturned state convictions because evidence was excluded and has "in recent years . . . made clear that . . . only in extreme cases" will such Sixth Amendment claims succeed. Fortini v. Murphy, 257 F.3d 39, 46 (1st Cir. 2001), cert. denied, 535 U.S. 1018 (2002). The ruling in this case was not mechanical or arbitrary or extreme. This is so whether one looks at the basis for the exclusion or at special circumstances that might justify an exception.

-14-

The evidence in question was traditional hearsay, arguably not within any established exception, and without any indicia of special reliability.  It is also not clear that the defense lacked means other than hearsay for establishing the reasons for Ortiz's eviction and the alleged back-and-forth threats; at least on appeal, there is no reference to a proffer on this point.  Compare White v. Coplan, 399 F.3d 18, 24-25 (1st Cir. 2005), cert. denied, 126 S. Ct. 478 (2005).

Nor was the excluded evidence especially powerful. Compare Chambers, 410 U.S. at 291-93.  It is quite true that O'Brien badly needed the excluded evidence because the circumstantial case against him was very powerful, and without the hearsay, there was little to make Ortiz an alternative suspect. But even with the testimony, the hearsay evidence would not have had much rational weight as against O'Brien's presence, his improbable story and the scientific evidence against him.

We no longer think that the "ghostly phantom of the innocent man falsely convicted," Di Carlo v. United States, 6 F.2d 364, 368 (2d Cir. 1925) (L. Hand, J.), is quite so improbable as once thought. Thus, the exclusion of powerful evidence, on dubious grounds and in a close case, prompts scrutiny even in an area largely governed by state law.  But this case has none of these characteristics.  The evidentiary ruling did not violate the Constitution.

<u>Affirmed</u>.