## Commonwealth *vs.* Edward S. O'Brien.

Middlesex. September 8, 2000. - October 18, 2000.

Present: Ireland, Spina, Cowin, & Sosman, JJ.

*Judge. Supreme Judicial Court,* Superintendence of inferior courts. *Practice, Criminal,* Transfer hearing, Admissions and confessions, Waiver, Voluntariness of statement, Capital case, Instructions to jury. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights by juvenile, Search and seizure. *Evidence,* Admissions and confessions, Hearsay, Relevancy and materiality, State of mind. *Search and Seizure,* Consent. *Homicide.*

This court's order, pursuant to G. L. c. 211, § 3, to the Chief Justice of the District Court to reassign a certain criminal case to another judge "to eliminate controversies and unnecessary issues in further proceedings and in any appeal" was final and not subject to review upon appeal from a conviction. [583]

Discussion of this court's exercise of supervisory powers under G. L. c. 211, § 3, including the power to remove and assign judges when justice requires. [583-584]

There was no basis in the record of a juvenile transfer hearing to support a claim that the judge drew inferences adverse to the defendant based on his assertion of his right to remain silent. [584-585]

In a criminal case, the judge correctly ruled that the defendant was not in custody when the police interrogated him at a hospital where he was receiving medical treatment [585-586]; and further, that, after consultation with his father, the juvenile defendant voluntarily consented to the seizure of physical evidence from his person by police [587]; finally, this court concluded, pursuant to G. L. c. 233, § 33E, that the defendant's statements at the hospital were made voluntarily [587-588].

In a murder case, the judge correctly concluded that, in the totality of the circumstances, the juvenile, after consulting with his father, voluntarily, knowingly, and intelligently waived his Miranda rights before submitting to interrogation at a police station. [586-587]

At a murder trial, the judge correctly excluded as hearsay evidence proffered to show that a third party might have committed the crime, where the evidence had no tendency to prove that the third party was actually the murderer. [588-589]

At a murder trial, the judge correctly admitted, as relevant to the defendant's state of mind, evidence that the defendant had in his possession a newspaper clipping regarding a murder with circumstances similar to that with which the defendant was charged. [589-590]

No substantial likelihood of a miscarriage of justice arose at a murder trial

from the judge's failure to instruct the jury, in accordance with the "humane practice," on the voluntariness of the defendant's statements to police, where voluntariness was not a live issue at trial. [590]

There was no error at a murder trial in the judge's refusing to instruct the jury on the claimed inadequacy of the police investigation, and the judge did not remove that issue from the jury's consideration. [590]

At a murder trial in which the evidence showed that the victim was stabbed ninety-eight times, the judge's instructions on extreme atrocity or cruelty contained no error. [590-591]

At a murder trial, there was no error in the judge's instruction to the jury that it was their duty to convict on the highest crime proved, nor were there any other errors in the instructions, considering the charge as a whole; nor did the asserted cumulative errors create a substantial likelihood of a miscarriage of justice. [591-592]

INDICTMENT found and returned in the Superior Court Department on August 11, 1995.

Following review by this court, 423 Mass. 841 (1996), and a motion for additional relief under G. L. c. 211, § 3, a motion to dismiss was heard by *Joseph A. Grasso, Jr.*, J.; motions to suppress were heard by *Margaret R. Hinkle*, J.; and the case was tried before *James D. McDaniel, Jr.*, J.

*Elizabeth A. Lunt* (*William B. VanLonkhuyzen* with her) for the defendant.

*David W. Cunis*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree under a theory of extreme atrocity or cruelty. On appeal he claims error in (1) our order removing the District Court judge originally assigned to preside over his transfer hearing; (2) the transfer judge's findings; (3) the failure to suppress his statements and certain physical evidence; (4) the exclusion of third-party culprit evidence; (5) the admission of evidence of the defendant's state of mind; (6) the refusal to give a "humane practice" instruction; (7) the refusal to give an instruction in accordance with *Commonwealth* v. *Bowden*, 379 Mass. 472 (1980); (8) the instructions on extreme atrocity or cruelty; and (9) the instruction on a jury's duty to convict. The defendant also asks us to reduce the verdict pursuant to G. L. c. 278, § 33E. We affirm the conviction and decline to reduce the verdict or to order a new trial.

We summarize the facts the jury could have found, reserving other details for discussion of the issues. The victim, Janet

Downing, was the mother of one of the defendant's best friends, Ryan Downing. The defendant and Ryan Downing belonged to a large and close-knit group of high school boys who lived in the Prospect Hill neighborhood of Somerville. The Downing home was a frequent gathering place for the boys, and Janet Downing was well liked by the group. The defendant, who was fifteen years old in July, 1995, lived across the street from the Downings on Boston Street.

The defendant developed a preoccupation with the victim during the year prior to her death. He watched her closely, sometimes through a telescope from his bedroom. He frequently asked Ryan and Paul Downing, Ryan's brother, about their mother's activities and told Ryan that he had watched her undress. The defendant remarked to several of his friends that he thought she was a lesbian.

During the evening of July 22, 1995, the defendant met Ryan Downing and they talked. At one point in the conversation, the defendant spoke of his desire to hurt someone. At about 7 P.M. on July 23, 1995, some boys, including the defendant, gathered in the kitchen at the Downing home to discuss plans for the evening. The victim was asleep on the living room couch, a fact which drew a comment from the defendant. The boys decided to go swimming, except the defendant, who said he was going to visit another friend, Garvey Salomon. The defendant never went to Salomon's house.

Paul Downing and Jeannie O'Brien, the defendant's sister, had been to Revere Beach and returned at about 8 P.M. Each went home briefly. The victim was still asleep on the couch. The defendant was sitting on his front porch. Paul and Jeannie left at about 8:20 P.M. to return to Revere Beach.

At about 9:20 P.M., three boys arrived at the Downing home looking for Ryan. They were friends of the defendant as well. They knocked at the front door and called out for Ryan, but there was no answer. One of the boys, Marco Abreu, heard a loud noise coming from the back yard, as if something were falling through tree branches. They heard rustling and the sound of branches breaking in the bushes behind the house. They knocked at the back door, but received no answer. One boy, John Fitzpatrick, walked to the top of Hamlet Street, which bordered the Downing's rear yard. He saw the defendant crouching in some bushes and then saw him jump out onto Hamlet Street. Fitzpatrick called out to the defendant, but received no

response. Abreu, who was further up the street and only twenty feet from the defendant, also called out to him. The defendant's hands were by his side, with fists clenched. As he passed under a streetlight, he turned and faced Abreu. His eyes were bulging and he was laughing. He then turned away and walked down Hamlet Street.

Ryan Downing arrived home at about 10 P.M. and found his mother lying lifeless on the dining room floor. Some furniture had been overturned and there were blood stains in the foyer, the kitchen, dining room, a bathroom, and in the cellar. He ran across the street to the O'Brien home and asked for help. The defendant's father called the police, who began arriving within one minute. Paramedics attempted to resuscitate the victim, then transported her to a hospital where she was pronounced dead.

In the meantime, the defendant entered the Midnite Convenience store in Union Square, a short distance from the Downing home, at about 10 P.M. He worked there on a part-time basis. He told the store clerk that he had been robbed and stabbed in the square by a black man and a Hispanic man. The defendant was bleeding from cuts on his hand. He also had cuts and scrapes on his legs, and appeared distraught. The clerk called the police. The defendant was taken to Somerville Hospital. Police at the Downing home learned about the defendant's report of having been stabbed and robbed. Believing there may be a connection between the two crimes because of their proximity in time and place as well as the fact that both involved a stabbing, two officers went to Somerville Hospital to interview the defendant.

The defendant's father was at the hospital. The officers asked him if they could interview the defendant. The defendant's father first spoke with the defendant alone, and they agreed he would speak to the officers about the crime he reported. The officers made note of his wounds, and that he appeared calm, alert, and cooperative as he related the details of the robbery. The defendant and his father consented to the officers' request to take his clothes and a swabbing of the blood stain on his right shin. The defendant and his father also agreed to bring the clothes to the police station, and to show the officers where the robbery took place. They then went to Union Square in separate cars and the defendant showed them where he had been robbed. The area was well lit, and foot traffic was heavy. The officers looked for blood and signs of a struggle, but found neither.

Finding no physical evidence to support the defendant's claim of having been mugged, the police began to doubt his story. Shortly after he arrived at the police station with his father, at about 1:15 A.M. on July 24, an officer advised the defendant of the Miranda rights. The defendant and his father signed a juvenile Miranda warning-waiver form. The defendant repeated his account of the robbery. He was unable to explain the scratches on his arms and legs. An officer who had been at the Downing home joined the interview. Near the end of the interview the defendant was asked if he or any of the other boys was involved in Janet Downing's murder. The defendant denied any involvement. He and his parents left the police station that night. The defendant was arrested on July 25, 1995, at about 7:15 P.M.

An autopsy revealed that Janet Downing sustained sixty-six stab wounds and thirty-two incised wounds (length greater than width). There were numerous stab and incised wounds to her neck, and small puncture wounds under her chin. Her upper right lung had seven stab wounds which corresponded to only two exterior wounds, signifying that a knife had been thrust into the two exterior wounds more than once. There was one stab wound to her lower left lung, and two to her liver. One stab was delivered with such force that it cut her second left rib in two. There were defensive wounds on her left hand and arm. The cause of death was determined to be a loss of blood due to multiple stab wounds, most significantly to the lungs and liver.

The defendant's fingerprints were found in blood on the inside of the front door and on a wooden post in the cellar. A knife hilt found on a stair in the front foyer of the Downing home was identical in size to that of a knife owned by the defendant that the police found in his trash, and he was known to have two such knives. Blood consistent with that of the defendant, and having a profile shared by approximately six per cent of the Caucasian population, was found in the front hallway of the Downing home. Deoxyribonucleic acid test results indicated that blood samples recovered from the Downing home on the front door, the dining room door, and a dress in the cellar matched the defendant's blood sample. The blood taken from the defendant's shin at the hospital was the same type as the victim's. Police also saw a trail of blood on Hamlet Street behind the Downing house and continuing about 500 feet along the route the defendant followed when he was seen by John Fitzpatrick and Marco Abreu the evening of July 23.

1. *Removal of the first transfer hearing judge.* The murder indictment satisfied the probable cause component of the juvenile transfer process under G. L. c. 119, § 61, as amended by St. 1992, c. 398, § 3. A transfer hearing was held on the Commonwealth's motion to transfer the defendant to the Superior Court for trial. The purpose of that hearing was to determine whether the defendant "presents a danger to the public, and whether [he] is amenable to rehabilitation within the juvenile justice system." G. L. c. 119, § 61, as amended by St. 1992, c. 398, § 3.[1] A District Court judge denied the Commonwealth's motion, and the Commonwealth appealed.

We reversed the order denying the transfer and remanded the case for further proceedings. See *Commonwealth* v. *O'Brien*, 423 Mass. 841 (1996). On remand the Commonwealth filed a motion requesting the transfer judge to recuse himself from further involvement in the case. The judge denied the motion summarily, and refused to make written findings in support of that denial. The Commonwealth sought relief under G. L. c. 211, § 3, from a single justice, who referred the matter to the full bench for administrative consideration. We ordered the Chief Justice of the District Court to reassign the case to another judge "to eliminate controversies and unnecessary issues in further proceedings and in any appeal." The defendant argues that we have no authority under G. L. c. 211, § 3, to order the reassignment of judges, that our order was arbitrary and capricious, and that our order violated his right to substantive due process under the Federal Constitution and the Massachusetts Declaration of Rights. That order was final and is not subject to review in this appeal. Nevertheless, we address the points raised by the defendant because they afford an opportunity to discuss in a published opinion our exercise of the supervisory powers.

Removal of a judge from a case is a serious matter that falls squarely within our "broader inherent common law and constitutional powers to supervise the administration of justice." *Foley* v. *Lowell Div. of the Dist. Court Dep't*, 398 Mass. 800, 804 (1986). See *Matter of DeSaulnier (No. 1)*, 360 Mass. 757, 759 (1971). Our responsibility under G. L. c. 211, § 3, is to that same end. See *Commonwealth* v. *Bastarache*, 382 Mass. 86,

[1]General Laws c. 119, § 61, was repealed by St. 1996, c. 200, § 7, approved, with emergency preamble, July 27, 1996, by § 39, effective October 1, 1996. The provisions of G. L. c. 119, § 61, apply to offenses committed prior to October 1, 1996. St. 1997, c. 208, § 2.

102 (1980). "In matters concerned with the administration of the courts and the trial of cases, we may impose requirements (by order, rule or opinion) that go beyond constitutional mandates." *Id.* When exercising our supervisory powers, we are not limited to correcting error, but may be guided by whatever is needed to ensure that cases are tried fairly and expeditiously. See *Foley* v. *Lowell Div. of the Dist. Court Dep't, supra.* When justice requires that we intervene in a *particular* case, as here, it is our obligation to act. Our supervisory powers are not limited to procedural problems; they include the power to remove and assign judges. See *Matter of DeSaulnier, supra.*

We had been especially critical of the judge who presided over the first transfer hearing. See *Commonwealth* v. *O'Brien, supra* at 854. Matters did not improve on remand. Unfortunately, for the reasons stated in our removal order, intervention became necessary in the interest of justice. No defendant, indeed, no person, has a vested interest in having a particular judge assigned to his case. We left the assignment to the Chief Justice of the District Court Department of the Trial Court. From that substitution, what the defendant could expect and what he was entitled to receive was a fair transfer hearing. He was entitled to no more. We turn now to our review of the hearing to determine whether that occurred.

2. *The transfer hearing.* The defendant argues that the District Court judge assigned to preside over the second transfer hearing impermissibly drew adverse inferences from the exercise of his constitutional right to remain silent. The issue was properly presented in the first instance to a judge in the Superior Court in a motion to dismiss. The defendant claims that the indictment should have been dismissed because the use of such inferences constitutes a "material failing in the prescribed steps leading to the issuance of the order of transfer." *Commonwealth* v. *Matthews,* 406 Mass. 380, 384 (1990), quoting *A Juvenile* v. *Commonwealth (No. 1),* 380 Mass. 552, 557 (1980).

The District Court judge expressly and meticulously disavowed any consideration of any assertion by the defendant, either directly or through counsel, of his right to remain silent. The defendant attempts to show that notwithstanding that disavowal the District Court judge went ahead and considered the defendant's assertion of his right to remain silent. He cites such findings by the judge as "he does not voice any need or desire for treatment"; "he has neither voiced nor exhibited ap-

parent motivation to change"; "his lack of apparent motivation for treatment; his lack of any overt signs of recognition of, of anxiety about, or of other emotional distress occasioned by, any problem or inadequacy he may perceive in himself"; and "he has shown no motivation for . . . involvement [in voluntary rehabilitation programs]." Implicit in this argument is the premise that the District Court judge could have made such findings *only* by drawing adverse inferences from the defendant's exercise of his right to remain silent. There is no basis for such a premise, and the record supports the contrary view. Two witnesses called by the defendant testified that treatment programs for pretrial detainees at the juvenile facility where he was held are specifically designed to offer treatment while actively discouraging detainees from discussing the circumstances surrounding their pending charges. The judge's findings were not based on the defendant's exercise of his right to remain silent, but on the defendant's failure to see any value in any treatment programs. The findings also were based on the defendant's conduct at the facility where he was held and the peer group with which he chose to associate. There was no error.

3. *Motions to suppress.* The defendant moved to suppress the statements he gave to police first at Somerville Hospital and later at the Somerville police station. He also moved to suppress certain physical evidence, namely, the blood swabbing from his shin, his fingerprints, the photographs, and clothing. A Superior Court judge denied those motions, and the defendant appeals from those orders.

(a) *Statement at the hospital.* The defendant first contends that the police should have given him the warnings prescribed by *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966), before interviewing him at the hospital. The Miranda warnings must be given 'before a person may be subjected to custodial interrogation. They need not be given if the interrogation is noncustodial. See *Commonwealth* v. *Larkin*, 429 Mass. 426, 432 (1999); *Commonwealth* v. *Bryant*, 390 Mass. 729, 736 (1984). When deciding whether an interrogation is custodial, a judge generally must weigh four factors: (1) the place of the interrogation; (2) whether the investigation had focused on the defendant, including whether there was probable cause to arrest the defendant; (3) the nature of the interrogation, including whether it was aggressive, or informal and accommodating; and

(4) whether the defendant was free to terminate the interview and leave. Rarely is any one of these factors determinative. *Id.* at 737. The judge's findings are entitled to substantial deference, but we make an independent inquiry to determine whether she applied the law correctly. See *Commonwealth* v. *Williams,* 388 Mass. 846, 851 (1983).

The judge's finding that the interrogation of the defendant at the hospital was noncustodial has ample support in the record. The police went to the hospital to interview the defendant as a victim of a robbery, which *he* reported. His father and uncle were present during the interview. The defendant had the opportunity to confer privately with his father, after which both agreed to the interview. There was no evidence that the police acted aggressively. The police did not think the defendant was a suspect or a witness in the Downing murder when they interviewed him at the hospital. They spoke to him only about the robbery that he reported. There were no constraints on his freedom, and he left the hospital after the interview. The judge correctly concluded that the interview at the hospital was noncustodial, and that Miranda warnings therefore were not required.

(b) *Statement at the police station.* The defendant next contends that he did not validly waive his Miranda rights after receiving the warnings later at the police station. Implicit in the judge's finding of a valid waiver is that the interrogation at the police station was custodial. We assume, without the benefit of findings, that the judge viewed the interrogation as custodial because it occurred at the police station, and because, by that time, the police had doubts about the defendant's account of his alleged mugging. The defendant does not dispute the judge's finding that he was advised of the Miranda rights at the police station and that both he and his father read and signed a juvenile Miranda warning form acknowledging they understood the rights and were willing to talk to the police. Nor does the defendant dispute her finding that both he and his father appeared "cooperative, calm, and alert." Rather, he contends that the judge failed to give sufficient consideration to his age, physical condition, lack of experience with the criminal justice system, his reliance on his father, and his father's weakened emotional condition after seeing the victim's body.

The judge based her decision on the "totality of the circumstances — both the characteristics of the accused and the

details of the interrogation." *Commonwealth* v. *Williams, supra* at 851-852. She also considered the requirement that a juvenile at least fourteen years old have the "opportunity to consult with an interested adult who was informed of, and understood, [the Miranda] rights." *Commonwealth* v. *Berry,* 410 Mass. 31, 35 (1991). We give substantial deference to the judge's findings. See *Commonwealth* v. *Edwards,* 420 Mass. 666, 670 (1995). She was not required to weigh the evidence to the satisfaction of a particular party. We have made an independent inquiry and are satisfied that the judge applied the law correctly in finding that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights at the police station.

(c) *Consent to search.* The judge's conclusion that the defendant, after consulting with his father, freely and voluntarily consented to the seizure of the physical evidence by police is firmly grounded in the record. Both were eager to cooperate with the police, and there was no evidence of any coercion by the police. The defendant and his father each signed a consent form. See *Commonwealth* v. *Krisco Corp.,* 421 Mass. 37, 46 (1995).

(d) *Voluntariness of statement.* Last, the defendant contends that the judge failed to make any findings that his statement to the police at the hospital was made voluntarily, apart from the Miranda issue. See *Commonwealth* v. *Tavares,* 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982). The motion to suppress and the supporting affidavit do not identify this as an issue, but instead focus on the Miranda issues. The accompanying memorandum of law mentions the issue briefly, but in conjunction with the defendant's receipt of the Miranda warnings, which limits the issue to his statements at the police station. The principal focus of the hearing as to the defendant's statement at the hospital was whether, at the time, he was a suspect in the killing. Further, counsel addressed only the Miranda issues in his oral argument on the motion to suppress evidence. We do not consider the question of the voluntariness of the statement at the hospital to have been adequately preserved for review. See Mass. R. Crim. P. 13 (a) (2), 378 Mass. 871 (1979).

We have, pursuant to G. L. c. 278, § 33E, reviewed the record and considered the briefs, and conclude that there is no reason to believe that the statements the defendant gave at the hospital were not voluntary. The judge found that the statement given by the defendant at the police station was voluntary. She

considered all the relevant factors identified in *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986), as well as the "totality of the circumstances," in making that finding. *Id.* Her finding appears from the record with "unmistakable clarity." *Commonwealth* v. *Tavares*, *supra*. If the defendant's statement at the police station was given voluntarily, his earlier noncustodial statement at the hospital was certainly also voluntary. The judge's subsidiary and ultimate findings about the noncustodial nature of the hospital interview are instructive. She found that the defendant "was in no apparent distress, nor did he appear to be under the influence of drugs or alcohol." "He was cooperative, calm, and alert, and there was no sign he was in any pain." The police had no idea he was involved in the Downing murder. His uncle and father were present with him. He presented himself as a crime victim, and the Downing murder was not discussed. There was no indication that the police questioned him in an aggressive manner, much less overbore his will. The issue of the voluntariness of any of his statements was never a live issue at trial, as we discuss in Part 6, *infra*. Where the defendant did not present the issue, and where there was no evidence which even suggests his statement at the hospital was not voluntary, any failure to raise or address the issue did not create a substantial likelihood of a miscarriage of justice.

4. *Exclusion of third-party culprit evidence.* The defendant claims error in the judge's exclusion of evidence that Artie Ortiz, the victim's brother-in-law, had motive, intent, and opportunity to commit the crime. That evidence consisted of a conversation between the victim and Regina Mahoney in which the victim expressed fear of Ortiz, based on his ongoing hostility toward her since she threw him out of her house in March, 1995, for dealing drugs.

The judge correctly excluded the evidence as hearsay. See *Commonwealth* v. *Mandeville*, 386 Mass. 393, 397-398 (1982). We have suggested that hearsay may be admitted, in the judge's discretion, to show that a third party might have committed the crime for which the defendant is being tried provided the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other "substantial connecting links" to the crime. See *Commonwealth* v. *Rosa*, 422 Mass. 18, 23 (1996); *Commonwealth* v. *Mandeville*, *supra* at 399. A judge's determination of relevancy will not be set aside absent an abuse of discretion, or unless justice requires a different

result. See *Commonwealth* v. *Rosa, supra*; *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979).

Mahoney's testimony would have no tendency to prove that Ortiz was actually the murderer, and would be confusing as no more than an opinion of Ortiz's involvement. See *Commonwealth* v. *Mandeville, supra* at 398. Mahoney testified that Ortiz appeared at the crime scene and crossed the police crime scene tapes looking for a set of keys. There was forensic evidence that Ortiz's blood (a sample of his blood was obtained) had some similarities with the victim's blood, so he could not be excluded as a source of blood found in the Downing home. (The same was true of the victim's former husband.) However, Mahoney also testified that she never saw any cuts, scratches, or blood on Ortiz that night, so it was unlikely that any blood at the scene was Ortiz's. There are insufficient connecting links between Ortiz and Downing's murder from which it might be argued that he killed her. The judge did not abuse his discretion in excluding the hearsay testimony of the conversation between the victim and Mahoney. Justice does not require a different result. *Commonwealth* v. *Rosa, supra.*

5. *Evidence of defendant's state of mind.* The judge admitted, over the defendant's objection, evidence of a front page Boston Herald newspaper article, dated about one month before the murder, found on a bureau in the defendant's bedroom, which bore the headline: "We're Natural Born Killers." The article described the fascination three men had with a motion picture, "Natural Born Killers," and how one had boasted to a girl after they killed an elderly man by stabbing him twenty-seven times. The defendant moved for a mistrial, but the judge denied the motion and immediately instructed the jury that the evidence was "not offered to show Defendant had a propensity to commit the crime," but "only on the simple, limited issue as to the Defendant's state of mind around the time of this incident."

The evidence was probative as to the defendant's state of mind. Cf. *Commonwealth* v. *Scott*, 408 Mass. 811, 820 n.9 (1990) (defendant's possession of magazine article about serial killer who gagged and strangled young women admissible as evidence of sexual desire and contemplation of modus operandi, where circumstances surrounding manner of death were sufficiently similar). Here, the unusually high number of stab wounds inflicted was similar to the number of stab wounds inflicted on the victim described in the newspaper article. Both

were cases of "overkill." Further, the apparent pleasure derived by the Herald article defendant in boasting about the killing provides context to this defendant's conversation with Ryan Downing the night before the killing in which he spoke of wanting to hurt someone. The article also could have explained what otherwise might appear to be a random act of violence. See *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 259 (1982). Whether to admit such an article is a matter committed to the sound discretion of the trial judge. Absent a showing of palpable error, we do not disturb that ruling. *Commonwealth* v. *Scott, supra* at 819.

6. *Refusal to give "humane practice" instruction.* The defendant requested that the question of the voluntariness of his statements be submitted to the jury in keeping with our "humane practice" rule. See *Commonwealth* v. *Tavares, supra* at 149-152. The judge agreed to submit the question to the jury, then seemingly forgot to follow through. The defendant failed either to object to the omission or to remind the judge. We review to determine whether the omission created a substantial likelihood of a miscarriage of justice, this being a case reviewed under G. L. c. 278, § 33E. Such an instruction is not required unless the voluntariness of the defendant's statements is a live issue at trial. See *Commonwealth* v. *Anderson*, 425 Mass. 685, 691 (1997). Here, it was not a live issue. The subject of voluntariness never arose. Counsel did not broach the subject in closing argument, as it would have been inconsistent with the defense theory that the defendant did not commit the crime. Cf. *Commonwealth* v. *Nieves*, 429 Mass. 763, 768-770 (1999). There was no substantial likelihood of a miscarriage of justice.

7. *Refusal to give* Bowden *instruction.* There is no merit to the defendant's claim that the judge erred by refusing to give an instruction in accordance with *Commonwealth* v. *Bowden*, 379 Mass. 472 (1980). We have said repeatedly that a judge is not required to instruct a jury on the claimed inadequacy of a police investigation. See, e.g., *Commonwealth* v. *Hardy*, 431 Mass. 387, 395 (2000). *Bowden* simply holds that a judge may not remove the issue from the jury's consideration. *Id.* at 486. The judge did not preclude the defendant from either presenting evidence on the issue or discussing it in closing argument. There was no error.

8. *Instruction on extreme atrocity or cruelty.* The judge's instruction on extreme atrocity or cruelty, to which there was no

objection, did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). The judge reviewed the factors which we have said the jury must consider. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). He then went through the factors a second time, expounding on some. His instruction that death caused by a single blow could, in some circumstances, as when directed against an infant, support a finding of extreme atrocity or cruelty, was correct. The victim was stabbed ninety-eight times, which the defendant's forensic expert acknowledged was exceptional. See *Commonwealth* v. *Jenner*, 426 Mass. 163, 166 (1997). The judge's emphasis on the second and third *Cunneen* factors, calling for evidence of "great savagery or brutality" and "repeated violent blows," was not incorrect, and certainly did nothing to reduce the Commonwealth's burden. Compare Model Jury Instructions on Homicide (1999) (describing extreme atrocity as "wicked or brutal; appalling; horrifying, or utterly revolting"). Finally, the judge's explanation of extreme cruelty as a "higher degree of cruelty," was not error. See *Commonwealth* v. *Painten*, 429 Mass. 536, 547-548 (1999). There was no error.

9. *Instruction on duty to convict on highest crime proved, and other miscellaneous instructions.* The judge instructed the jury that it was their "duty — if you conclude that the [d]efendant is guilty of any offense . . . to return a verdict on the highest crime or crimes which have been proven by the Commonwealth, beyond a reasonable doubt." This was a correct instruction. See *Commonwealth* v. *Dickerson*, 372 Mass. 783, 797 (1977). The defendant objected to the judge's failure to give a parallel instruction on the duty to acquit if the Commonwealth failed to prove any crime. We have never required such an instruction. See *Commonwealth* v. *Sheline*, 391 Mass. 279, 297 (1984). The judge had given a forceful instruction on the presumption of innocence and the Commonwealth's burden of proof. In considering the charge as a whole, *Commonwealth* v. *Wolinski*, 431 Mass. 228, 233 (2000), it was balanced, and there was no risk that the jury would have misunderstood their duty to acquit if the Commonwealth failed to meet its burden. Cf. *Commonwealth* v. *Sheline*, *supra*. There was no error.

The defendant quarrels with other aspects of the judge's charge, including his use of the words "reasonably possible" instead of the correct "reasonable and possible." See *Com-*

*monwealth* v. *Cohen*, 412 Mass. 375, 380 (1992). We seriously doubt that this isolated minor lapse in a five-page instruction on inferences emboldened the jury to "engage in speculation, conjecture, and guesswork," as the defendant suggests. The instruction, in its entirety, was not misleading.

The judge's "negative" instruction on reasonable doubt (what reasonable doubt is not), to which there was no objection, did not dilute the Commonwealth's burden of proof. We previously considered a similar instruction and determined that it was not erroneous. See *Commonwealth* v. *Seay*, 376 Mass. 735, 745-746 (1978).

Finally, the judge told the jury at the end of his charge that their "sole interest is to ascertain the truth." This drew no objection, and it did not create a substantial likelihood of a miscarriage of justice. The judge had thoroughly and clearly instructed the jury that the Commonwealth's burden was to prove all elements of the crime beyond a reasonable doubt. The dubious value of the judge's parting words, when viewed against the charge as a whole, did not likely mislead the jury as to their duty. See *Commonwealth* v. *Allard*, 429 Mass. 756, 761-762 (1999).

The cumulative effect of these instructions did not create a substantial likelihood of a miscarriage of justice.

10. *Review under G. L. c. 278, § 33E.* We have reviewed the briefs and the entire record. This case does not warrant any reduction in the degree of guilt, or a new trial.

*Judgment affirmed.*