COMMONWEALTH *vs.* MARTIN GUY.

Norfolk. April 10, 2009. - July 31, 2009.

Present: MARSHALL, C.J., SPINA, COWIN, BOTSFORD, & GANTS, JJ.

*Evidence,* Relevancy and materiality. *Practice, Criminal,* Argument by prosecutor, New trial, Capital case, Fair trial. *Deoxyribonucleic Acid. Homicide.*

At a murder trial, the judge did not abuse her discretion in admitting evidence that the defendant often discussed and read books about serial killers, where the evidence was relevant to the defendant's motive and state of mind and to explain what otherwise might be seen as an inexplicable act of violence; where the prosecutor elicited the testimony and referred to it in his closing in a technical, analytical manner, without drama or undue emphasis that might have released its potential for unfair prejudice; and where the evidence was not temporally remote. [443-444]

At a murder trial, certain statements by the prosecutor constituted an embellishment of the permissible argument that the Commonwealth "got it right," and to the extent that the prosecutor improperly brought the feelings of the victim's husband and other members of the community to the jury's attention, the prosecutor's impropriety was brief and insignificant with respect to the over-all thrust and tone of the closing, and the prosecutor did not otherwise disparage the defense. [444-445]

At a criminal trial, the jury's use in their deliberations of certain items marked only for identification did not raise a serious question of possible prejudice, given that there was no suggestion that the items failed to reflect accurately witness testimony. [445-446]

A trial court judge did not err in denying a criminal defendant's motion for a new trial, which alleged newly discovered evidence regarding deficiencies in the operation of the Massachusetts State police crime laboratory with respect to the processing of deoxyribonucleic acid (DNA) evidence, where no evidence produced by the defendant had any apparent bearing on the accuracy of the Maine laboratory DNA test results at issue in the defendant's case. [446-448]

INDICTMENT found and returned in the Superior Court Department on June 11, 2004.

The case was tried before *Judith Fabricant*, J., and a motion for a new trial, filed on December 5, 2007, was considered by her.

*Richard J. Fallon* for the defendant.

*Pamela Alford*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. On appeal he asserts that (1) the trial judge erred by admitting evidence that the defendant often discussed and read articles about serial killers, (2) the prosecutor improperly appealed to emotions of the jury in closing argument, (3) the judge erred by allowing an item marked only for identification to be considered by the jury in their deliberations, and (4) the judge erred in denying his motion for a new trial, which alleged deficiencies in the operation of the Massachusetts State police crime laboratory with respect to the processing of deoxyribonucleic acid (DNA) evidence. The appeals from the judgment of conviction and the denial of the motion for a new trial have been consolidated. We affirm the conviction and the order denying the motion for a new trial, and we decline to grant any relief under G. L. c. 278, § 33E.

1. *Background.* On the morning of December 1, 1998, the victim and her husband of fifty years took their daily walk through Bird Park in Walpole. At one point she was separated briefly from her husband. When she did not return to the parking lot after about ten or fifteen minutes, her husband went to look for her. He found her lying on the ground, dead. Her body was partially clad and bloody. Some clothing had been torn. The cause of death was determined to be multiple stab wounds (thirty-two across much of her body), manual strangulation, and blunt head trauma. Other than the bite marks on her breasts, there was no evidence that she had been sexually assaulted.

Bite marks on the victim's breasts and the presence of amylase, a component enzyme of saliva, in the right cup of her brassiere suggested the possible presence of DNA from the assailant. Swabbings were taken from her left breast and a cutting was taken from her brassiere. Because it was anticipated that the samples probably contained mixtures of DNA from both the victim and her assailant, and because the DNA unit of the Massachusetts State police crime laboratory only recently had opened and could not provide DNA testing or results on mixtures, the samples were sent to the Maine State police crime laboratory, which was equipped to do the testing.

On December 15, 1998, the Maine laboratory obtained a nine loci major male DNA profile from the mixture on the brassiere

cutting. However, only profiles with more than ten loci could be uploaded into the Federal Bureau of Investigation's (FBI's) combined DNA index system's (CODIS) national DNA database (NDIS). In May, 2000, the Maine laboratory began using two newly available kits, Profiler Plus and Cofiler. The samples were retested using Profiler Plus only, due to the small size of the samples. This produced a twelve loci major male profile from the sample on the brassiere cutting.

On May 18, 2000, the Maine laboratory uploaded the twelve loci major (unknown) male profile obtained from the brassiere cutting into the CODIS national database (NDIS). On August 15, 2003, it received notice of a "hit" to the defendant's profile.[1] On September 5, 2003, the Maine laboratory obtained a known saliva sample from the defendant from which it obtained a thirteen loci profile. That DNA profile matched the DNA profile obtained from the cutting from the victim's brassiere. The probability that the DNA profile of an unrelated Caucasian male would match the DNA profile from the brassiere cutting is one in 268 trillion.

In July, 2003, an inmate serving a prison sentence for intimidation of a witness, perjury, and arson wrote to the Norfolk County district attorney indicating that he had information that might be helpful to this investigation. He further indicated that he would like to receive help in getting his sentence reduced. The inmate testified at the trial in this case that in late 2001 or early 2002 he saw a news account of a man who had been mistakenly arrested for the victim's murder.[2] He had a conversation about the matter with the defendant, who told him (before the defendant was charged) that it was "pretty funny" that the wrong man had been

---

[1]The defendant's DNA profile was entered in the Federal Bureau of Investigation's (FBI's) combined DNA index system's (CODIS) State database (SDIS) by the Massachusetts State police (MSP) CODIS administrator on June 17, 2003. On June 21, the MSP CODIS administrator was notified that the DNA profile of the unknown donor in this case produced a "hit" to the defendant's profile. This information was shared with the Maine laboratory. After he was arrested on another matter, the defendant's DNA profile was entered in the national database (NDIS), which has more rigorous standards, on August 8, 2003.

[2]A tracking dog was used by police on the day of the murder to follow a scent from the leaves between the victim's legs. The dog indicated several times that it was losing the scent, e.g., by circling an area, but eventually went to a house on a street adjacent to the park. It was the home of the brother of the victim's son-in-law. He told police he had been in Bird Park a few days

arrested for the victim's murder, as the defendant was the one who killed her. The defendant said he had been "trolling" the park for a victim and had an interest in the victim after seeing her on several occasions with her husband. Another woman had been his primary target, but the victim provided him an opportunity when she walked away from her husband. The defendant passed her and she greeted him. He said "hello," took two steps past her, then doubled back and threw her into a choke hold. He beat, stabbed, and bit her. The defendant said it was a "thrill."

The defendant grew up in Walpole and was familiar with Bird Park. He had worked delivering pizzas for a pizza parlor in Walpole since 1994, and he also delivered newspapers. Generally quiet, he became talkative with coworkers when the subject of the murder investigation arose.

2. *Evidence of defendant's interest in serial killings.* The defendant argues that evidence that he spoke to coworkers about serial killings, and that he often read books[3] about murder and serial killings that, he argues (erroneously), were found in a search of his mother's home (where he lived) in 2003, was irrelevant and unfairly prejudicial. The defendant preserved the issue for appellate review. The decision to admit such evidence is within the sound discretion of the judge. See *Commonwealth* v. *O'Brien*, 432 Mass. 578, 590 (2000).

The evidence was relevant to the defendant's motive and state of mind and to explain what otherwise might be seen as an inexplicable act of violence. *Id.* See *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 269 (1985). The prosecutor elicited the testimony and referred to it in his closing in a technical, analytical manner,

---

before, walking his cats. Thereafter, on December 10, 1998, he was arrested and charged with the victim's murder. A forensic dentist had opined there was a high degree of probability that his teeth caused the bite marks on the victim's left breast. In January, 1999, the charges were nol prossed after the Maine State police crime laboratory excluded him as the donor of DNA in saliva on the victim's left breast. He was excluded as a DNA donor on all other evidentiary items subsequently tested. He also was excluded as the person who produced a bloody palm print on the victim's hip. A different forensic dentist subsequently opined that he did not cause the bite mark on the victim's left breast. The second forensic dentist opined that the defendant caused those bite marks. A third forensic dentist, called by the defendant, opined that the defendant did not cause the bite marks.

[3]The books were not admitted in evidence.

without drama or undue emphasis that might have released its potential for unfair prejudice.

There is no merit to the claim that testimony about his books on serial killings, which allegedly were seized approximately four years after the killing in this case, was temporally too remote to be relevant. The books were not seized from his mother's home. They were seized from the defendant's apartment in September, 1999, in connection with a prior case,[4] not in connection with this case. Moreover, four coworkers testified that he often read such books. Evidence of the defendant's fascination with murder and serial killings was relevant to the issue of intent and motive, and was not temporally remote. There was no abuse of discretion.

3. *Prosecutor's closing argument.* The defendant asserts error in the judge's denial of his motion for a mistrial based on the prosecutor's closing argument. The prosecutor had addressed a point made by defense counsel in his opening statement to the effect that the jury would have to "decide whether or not [the Commonwealth] proved beyond a reasonable doubt [and] to a moral certainty they *got it right this time*," referring to the decision to nol pros the charges against the person first arrested for this murder (emphasis added). The prosecutor had argued to the jury:

> "When [defense counsel] finished his opening statement to you, he asked a question. And the question that he asked was did they get it right this time. Well, the answer to [defense counsel], the answer for [the victim's] family, the answer for [the man first arrested] and his family, the answer for people . . . that walk around the park, the answer for all of the citizens of the town of Walpole is 'yes'. We got it right this time. We got it right, and the person who brutally, savagely and animalistically killed, murdered [the victim] on that date is seated right here. It's Martin Guy."

The defendant argues this was an improper appeal to sympathy. Defense counsel's basis for the motion for a mistrial was that the prosecutor had drawn the feelings of people present in the

---

[4]See *Commonwealth* v. *Guy*, 441 Mass. 96 (2004).

court room into the discussion, as though their feelings were a matter of importance for the jury's consideration.

The nature of an appeal to sympathy is not so much a misstatement of evidence as an obfuscation of "the clarity with which the jury would look at the evidence and encourage[ment of] the jury to find guilt even if the evidence does not reach the level of proof beyond a reasonable doubt." *Commonwealth* v. *Santiago*, 425 Mass. 491, 501 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). The Commonwealth concedes that the prosecutor should not have brought the feelings of the victim's husband and other members of the community to the jury's attention, but it argues that there was no prejudice. We agree.

This was not a hard driving appeal to sympathy, but more of an embellishment of the permissible argument that the Commonwealth "got it right." The argument in its entirety was a well-reasoned discussion of the questions raised by the defense and a methodical marshaling of all the evidence in support of the Commonwealth's case. The prosecutor laid out in his closing argument with special care the work that was done in this case, an added burden needed to overcome the embarrassment to the Commonwealth of the earlier arrest of the wrong person. Rather than seeking obfuscation, the prosecutor promoted clarity. The judge instructed the jury that they must be "completely fair and impartial" and free of "sympathy," and that they must "not . . . consider any effect [their] verdict may have on any party, any witness, or any other person or any reaction that any person might have to [their] verdict." Although the Commonwealth's case was not without its challenges, particularly the arrest and release of its first suspect, and the conflicting forensic dentistry opinions (none of which was especially impressive), on the whole it was very strong and persuasive. The prosecutor's impropriety was brief, it was insignificant with respect to the over-all thrust and tone of the closing, and the prosecutor did not otherwise disparage the defense. Instead, he addressed the defense respectfully, methodically, and with clarity. We are satisfied that the prosecutor's comment did not inflame the jury. Contrast *Commonwealth* v. *Santiago, supra.*

4. *Exhibit marked for identification.* The judge ruled that

DNA "notebooks" provided to jurors during the testimony of a forensic DNA analyst from the Maine laboratory could be used by jurors during deliberations. A copy was marked "P" for identification. The defendant objected and moved for a mistrial. During deliberations the jury sent a note asking if they could see items marked for identification or if they would be provided a list of such items. The judge responded by writing, "No. Those items are not exhibits in evidence, but were marked only to keep track of them for the record." The defendant argues that the jury were misled to think these DNA notebooks were evidence, when in fact they were not. This was error, but not prejudicial.

The "notebooks" essentially were summaries used during the testimony of the witness that compared DNA profiles of approximately twenty individuals considered in the investigation, including the victim's husband, the man first arrested, and the defendant, with the DNA profile obtained from saliva on the victim's left breast and brassiere. The notebooks permitted the jury to follow the complex and somewhat lengthy testimony and visually comprehend its import, during which the forensic DNA analyst explained why she was able to exclude all donors except the defendant, and why the DNA evidence pointed convincingly to the defendant. The notebooks mirrored the witness's testimony, and summarized it visually as an aid to its understanding. As such, they were a useful nonprejudicial[5] aid to jurors. See *Commonwealth* v. *Walter*, 10 Mass. App. Ct. 255, 264 (1980); *Commonwealth* v. *Boyden*, 9 Mass. App. Ct. 857 (1980).

There is no suggestion that the notebooks failed to reflect accurately the witness's testimony. We are satisfied that the jury's use of the notebooks did not expose them to extrinsic material outside the record so as to raise a serious question of possible prejudice. *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978).

5. *Motion for a new trial.* The defendant filed a motion for a new trial based on newly discovered evidence, which consisted of a September, 2006, audit report by the United States Depart-

---

[5]The judge would have acted within her discretion had she admitted the "notebooks" in evidence. See *Commonwealth* v. *Greenberg*, 339 Mass. 557, 581-582 (1959); *Welch* v. *Keene Corp.*, 31 Mass. App. Ct. 157, 165-166 (1991); Mass. G. Evid. § 1006 (Summaries) (2008-2009).

ment of Justice concerning "Compliance with Standards Governing Combined DNA Index System Activities at the Massachusetts State Police Crime Laboratory, Sudbury, Massachusetts," covering the time period from June, 1999, through May, 2006, a "Final Report and Recommendations Regarding Vance's Comprehensive Operational Assessment of the Massachusetts State Police Crime Laboratory System," dated June 29, 2007, prepared for the Commonwealth's Executive Office of Public Safety, and an article in the January 17, 2000, issue of The New Yorker magazine. He first claims that his name never would have surfaced without the "hit" in the CODIS State database (SDIS), which was obtained as a result of information provided by the Massachusetts laboratory. He argues that the information in these newly discovered materials exposed deficiencies in the Massachusetts laboratory that would have cast considerable doubt on the persuasive nature of the DNA evidence adduced against him at trial. We disagree.

Although this "hit" focused attention on the defendant and led to the Commonwealth's obtaining a new sample of his DNA which then was sent to the Maine laboratory, it was the comparison by the Maine laboratory of his known DNA sample with the male DNA samples from the crime scene that led to the critical match used at trial. All of the relevant incriminating DNA evidence was obtained solely through the efforts of the Maine laboratory, not the Massachusetts laboratory.

The defendant next contends that the Massachusetts laboratory played a critical role in securing and transmitting from the crime scene to the Maine laboratory samples that were then used to identify the perpetrator's DNA profile. He argues that the newly discovered materials could have been used to impeach the Massachusetts laboratory's collection and transmittal of that evidence. Without addressing all of the defendant's points, none of which has merit, we highlight the fact that the saliva swabs from the victim's breast and the saliva on the victim's brassiere used to identify the DNA profile of the perpetrator were collected by the crime scene services unit and the criminalistics unit of the Massachusetts laboratory, which are separate and distinct from the DNA unit. The particular points of criticism in the newly discovered materials on which the defendant relies relate to the DNA unit, not the units that collected and transmitted the evidence.

Nothing the defendant points to in the newly discovered materials addresses or affects the DNA evidence presented by the Maine laboratory. There is no merit to the other points raised by the defendant in support of his motion for a new trial. The motion judge, who was also the trial judge, correctly concluded that the materials relied on by the defendant in his motion for a new trial had no apparent bearing on the accuracy of the Maine laboratory test results in a way that had not been raised at trial.

6. *G. L. c. 278, § 33E.* We have reviewed the entire record and have found no grounds warranting relief under G. L. c. 278, § 33E.

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*